Gloria HAAG, Plaintiff,

v.

Jo Anne B. BARNHART,
Commissioner of Social
Security, Defendant.

Civ.A. No. 02–G–0984M.

United States District Court,
N.D. Alabama,
Middle Division.

Sept. 1, 2004.

R. Michael Booker, R. Michael Booker PC, Birmingham, AL, for plaintiff.

Alice H. Martin, U.S. Attorney, Edward Q. Ragland, U.S. Attorney's Office, Birmingham, AL, Mary Ann Sloan, Joseph P. Palermo, III, Roy F. Satterwhite, III, Doug Wilson, Social Security Administration—Office of General Counsel, Atlanta, GA, for defendant.

## MEMORANDUM OPINION

GUIN, District Judge.

The plaintiff, Gloria Haag, brings this action pursuant to the provisions of section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner of the Social Security Administration (the Commissioner) denying her application for Disability Insurance Benefits (DIB), a Period of Disability (POD) and Supplemental Security Income Benefits (SSI).[1]

Plaintiff timely pursued and exhausted her administrative remedies available before the Commissioner. Accordingly, this case is now ripe for judicial review under 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g).[2]

### STANDARD OF REVIEW

The sole function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied. *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir.1983). To that end this court "must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Bloodsworth,* at 1239 (citations omitted). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Bloodsworth,* at 1239.

### STATUTORY AND REGULATORY FRAMEWORK

In order to qualify for disability benefits and to establish his entitlement for a period of disability, a claimant must be dis-

---

1. In general the legal standards to be applied are the same regardless of whether a claimant seeks Disability Insurance Benefits (DIB), to establish a "Period of Disability," or to recover Supplemental Security Income (SSI). However, different statutes and regulations apply to each type of claim. Many times parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations of statutes or regulations found in quoted court decisions.

2. 42 U.S.C. § 1383(c)(3) renders the judicial review provisions of 42 U.S.C. § 405(g) fully applicable to claims for SSI.

abled. The Act defines disabled as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(i). For the purposes of establishing entitlement to disability benefits, "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant is disabled, Social Security regulations outline a five-step sequential process. 20 C.F.R. § 404.1520(a)-(f). The Commissioner must determine in sequence:

(1) whether the claimant is currently employed;

(2) whether she has a severe impairment;

(3) whether her impairment meets or equals one listed by the Secretary;

(4) whether the claimant can perform her past work; and

(5) whether the claimant is capable of performing any work in the national economy.

*Pope v. Shalala,* 998 F.2d 473, 477 (7th Cir.1993); *accord McDaniel v. Bowen,* 800 F.2d 1026, 1030 (11th Cir.1986). "Once the claimant has satisfied Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have a listed impairment but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job." *Pope,* at 477; *accord Foote v. Chater,* 67 F.3d 1553, 1559 (11th Cir.1995).

In the instant case, the ALJ, Jerome L. Munford, determined the plaintiff met the first two tests, but concluded did not suffer from a listed impairment. The ALJ found the plaintiff was able to perform her past relevant work, and accordingly found her not disabled.

## DISCUSSION

The plaintiff alleges she is disabled due to asthma, chronic obstructive pulmonary disease (COPD), pain and depression. At her ALJ hearing she testified that she felt very worthless because of her inability to work and that she was hardly able to go out of her house anymore. When asked why, she responded: "I'm so depressed and feel so defeated about all this." [R 56] She testified she has crying spells and feels that she is suffering from depression but was unable to seek treatment because she could not afford it. [R 57]

Subsequent to the hearing, the Social Security Administration sent the plaintiff to a psychiatrist for evaluation. Dr. Traynor found the plaintiff's speech to be "pressured, circumstantial and at times irrelevant." [R 854] The plaintiff "could not stay on one topic." Her affect was "very labile and inappropriate at times." Dr. Traynor noted that "[s]he cried frequently, but also laughed too much." Dr. Traynor found her to be "potentially suicidal." It was noted that "[s]he has no psychotic ideation, but behavior fluctuates markedly." Dr. Traynor observed: "She has anhedonia and feels helpless and hopeless. Insight is poor. Judgment is fair." Dr. Traynor concluded her narrative report:

> She knows she needs help, but can't afford care or medication. She remains socially isolated alot [sic.]. Intelligence is probably low average, but ability to concentrate is impaired. Wants things to be just right and they are bad.

[R 854] Dr. Traynor's diagnosis was as follows:

| | | |
|---|---|---|
| Axis I: | (293.83) | Mood Disorder with mixed features due to a closed head injury. |
| Axis II: | (301.4) | Obsessive–Compulsive Personality Disorder. |
| Axis III: | Severe Asthma, Closed Head Injury with permanent damage. | |
| Axis IV: | Severe Stressors | |
| Axis V: | GAF 35 | |

[R 854] Dr. Traynor recommended that she "[n]eeds psychiatric help to stabilize her mood and decrease her depression." Her prognosis was "guarded."

The diagnostic code used by Dr. Traynor (293.83) corresponds to Mood Disorder Due to a General Medical Condition. "The essential feature of Mood Disorder Due to a general Medical Condition is a prominent and persistent disturbance in mood that is judged to be due to the direct physiological effects of a general medical condition." *Diagnostic and Statistical Manual of Mental Disorders* 401 (4th Edition, Text Revision)("DSM–IV–TR") The diagnostic criteria for Mood Disorder Due to a general Medical Condition requires the following:

A. A prominent and persistent disturbance in mood predominates in the clinical picture and is characterized by either (or both) of the following:

 (1) depressed mood or markedly diminished interest or pleasure in all, or almost all, activities

 (2) elevated, expansive, or irritable mood

B. There is evidence from the history, physical examination, or laboratory findings that the disturbance is the direct physiological consequences of a general medical condition.

C. The disturbance is not better accounted for by another mental disorder (e.g., Adjustment Disorder With Depressed Mood in response to the stress of having a general medical condition).

D. The disturbance does not occur exclusively during the course of a delirium.

E. The symptoms cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.

DSM–IV–TR at 404. The type descriptor "With Mixed Features" is used "if the symptoms of both mania and depression are present but neither predominates." DSM–IV–TR at 404 (emphasis added). The general medical condition causing the plaintiff's mood disorder is her closed head injury.

█ As part of her diagnosis, Dr. Traynor assigned a GAF of 35. The Global Assessment of Functioning (GAF) Scale is used to report an individual's overall level of functioning. DSM–IV–TR at 32. A rating of 31–40 reflects:

**Some impairment in reality testing or communication** (e.g., speech is at times illogical, obscure, or irrelevant) **OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood** (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

DSM–IV–TR at 34 (emphasis in original). A GAF of 35 is strong evidence of an inability to work. *See Lloyd v. Barnhart*, 47 Fed.Appx. 135, 2002 WL 31111988 at *1, n. 2 (3rd Cir.2002)(not precedential)(noting that a vocational expert at the administrative hearing testified that a GAF of 50 or lower would indicate claimant would not be able to keep a job).

Dr. Traynor also completed a Medical Source Statement (Mental) in conjunction with her examination. On that form, she indicated a "marked" level of impairment in *seven* areas. She indicated an "extreme" level of impairment in the following *five* areas:

- Understand, remember, and carry out complex instructions

- Perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances
- Complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.
- Respond appropriately to supervision.
- Respond to customary work pressures.

[R 855–857]

When the appropriate Listing is consulted, it is apparent that based upon Dr. Traynor's report, the plaintiff is disabled. Listing 12.02 concerns mental disorders that are "[p]sychological or behavioral abnormalities associated with a dysfunction of the brain." The listing requires that a claimant meet a two part test. The first part (the "A" criteria of the listing) requires:

Demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following:

1. Disorientation to time and place; or

2. Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or

3. Perceptual or thinking disturbances (e.g., hallucinations, delusions); or

4. Change in personality; or

5. Disturbance in mood; or

6. Emotional liability (e.g., explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or

7. Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g., the Luria–Nebraska, Halstead–Reitan, etc.

Listing 12.02 also requires that the disorder cause functional limitations as set forth in 12.02(B) (the "B" criteria of the listing). In order to satisfy the "B" criteria, a claimant must demonstrate that his disorder results in at least two of the following:

1. Marked [3] restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or

4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

20 C.F.R. Pt. 404, Subpt. P., App. 1, 12.02.

When Dr. Traynor's report is compared to the requirements of Listing 12.02, it is clear that plaintiff has more than satisfied

---

**3.** For the purposes of the mental disorder listings, "marked" means "more than moderate but less than extreme." Furthermore, a "marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively." 20 C.F.R. pt. 404, Subpt. P, Appendix 1, § 12.00.

the requirements of both the A and B criteria. Therefore, she is disabled if Dr. Traynor's report is credited.

█ Remarkably, the ALJ refused to credit the Commissioner's own consulting psychiatrist even though there is no other mental examination from an examining medical source in the record. The ALJ's rejection of Dr. Traynor's diagnosis and evaluation rests primarily upon his determination that the impairments noted by Dr. Traynor had not lasted for a continuous 12 month period prior to the date of Dr. Traynor's examination on January 7, 1999. In addition, the ALJ found that her condition would not be expected to last for 12 continuous months. The following quotation from his decision illustrate the great length to which he went in order to find the plaintiff not disabled in spite of Dr. Traynor's clearly expressed opinions:

Although Dr. Traynor indicated in her report that the claimant had marked mental limitations which lasted or could be expected to last for twelve months or longer at the level of severity indicated, she did not indicate that the claimant's mental limitations had already lasted for a period of twelve consecutive months and the evidence as a whole does not establish that the claimant's mental limitations have been greater than moderate for any period of twelve consecutive months beginning prior to January 1999.

[R 20] The ALJ made this finding in spite of the fact that Dr. Traynor circled "yes" to the question: "Have the claimant's impairment caused limitations lasted or can they be expected to last for 12 months or longer at the level of severity indicated?" [R 857] This can be read as a belief by Dr. Traynor that the impairments had already existed for 12 months. The ALJ did not even consider that possibility, and did not

re-contact Dr. Traynor for clarification. The ALJ continued his denouncement of the Commissioner's own consulting psychiatrist:

In addition, although Dr. Traynor indicated that the claimant's mental limitations could be expected to last for twelve months or longer at the level of severity indicated, *this is simply a guess, and has not yet occurred.*

[R 20 (emphasis added).] Dr Traynor is the Commissioner's consulting psychiatrist and, therefore, must have been deemed qualified by the Commissioner to assess the mental status of the claimant.[4] Her diagnoses and opinions are not guesses, but rather are the result of "medically acceptable clinical and laboratory diagnostic techniques" which are sufficient under the Commissioner's regulations to establish an impairment. 20 C.F.R. § 404.1508. The statutory standards for disability do not require that the impairment has lasted 12 months at the time the disability determination is made. The standard requires a disabling condition "which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(i). Thus Dr. Traynor's answer meets the statutory requirement.

ALJ Munford also opined that treatment would reduce the plaintiff's mental illness to a non-disabling level:

If the claimant were to receive the psychiatric help recommended by Dr. Traynor to stabilize her mood and decrease her depression, it is reasonable to conclude that the claimant's mental limitations would be no more than mild to moderate.

[R 20] From this it is reasonable to conclude ALJ Munford believes he has an

---

4. Surely the Commissioner would not send the plaintiff to an unqualified psychiatrist for evaluation.

insight into the complex area of mental illness superior to that of Dr. Traynor, a psychiatrist. He presumes to conclude that if the plaintiff were to receive the recommended treatment, she would respond and become better. Dr. Traynor's prognosis was "guarded" indicating that she was not optimistic about the prospects for improvement. There is no medical evidence in the record to support the ALJ's conclusion that the plaintiff's impairment would improve to the point to allow work. It must be remembered that the plaintiff's mood disorder is, according to Dr. Traynor, caused by a "Closed Head Injury with permanent damage." This is certainly different than mood disorders resulting from other causes. Dr. Traynor recommended treatment to "stabilize her mood and decrease her depression," but there is no indication that she believed the plaintiffs depression and mood instability were certain to respond to treatment. Nor is there any definite opinion given as to the degree of improvement to be expected from the treatment.

The present case bears a remarkable resemblance to the situation in *Wilder v. Chater*, 64 F.3d 335 (7th Cir.1995). In that case the court was faced with an ALJ who had improperly ignored the opinions of a consulting psychiatrist who was appointed by the Commissioner. The *Wilder* court observed:

> We are led to consider with a degree of suspicion the administrative law judge's decision to go against the *only medical evidence in the case, that of a psychiatrist not retained by the applicant but appointed by the administrative law judge himself* to advise on Wilder's condition.... The psychiatrist's testimony, though conclusional (but then no one pressed him to elaborate the grounds for his conclusions), was the only direct testimony concerning the critical issue of the date of onset of Wilder's disabling depression. Severe depression is not

the blues. It is a mental illness; and *health professionals, in particular psychiatrists, not lawyers or judges, are the experts on it.* The question what stage a physical or mental illness had probably reached some years before it was first diagnosed is a medical question, and *the uncontradicted evidence of the only disinterested expert to opine upon it is entitled to considerable weight.* We do not say conclusive weight; but the facts on which the administrative law judge relied to contradict that evidence are singly and together unimpressive.

*Id.* at 337 (emphasis added) (citations omitted).

In the present case the ALJ, likewise, rejected the opinions of the only competent medical source, Dr. Traynor about how long the plaintiff's mental impairment could be expected to last. As noted above, the ALJ determined the plaintiff's mental impairment had not been at a disabling level for a period of twelve months prior to Dr. Traynor's examination. This was in spite of Dr. Traynor's indication on the Medical Source Statement (Mental) form that is consistent with a belief that it had already lasted at a disabling level for twelve months at the time of the examination. There is, however, evidence outside of Dr. Traynor's report supporting a finding that the plaintiff's mental impairment had been disabling for a period of twelve months at the time of the ALJ's hearing decision. The plaintiff testified at her hearing two months prior to Dr. Traynor's examination about her depression. The diagnostic assessment of Dr. Jin, another of the Commissioner's consulting doctors, included "[e]motional trouble" following his April 6, 1998 examination. This examination is over one year prior to the ALJ's hearing decision, which is dated May 29, 1999. Therefore, the plaintiff's mental problems were medically documented to have existed for at least twelve months at

the time of the hearing decision. There may be little medical evidence as to the exact severity of those impairments prior to Dr. Traynor's examination, but there is also no competent medical evidence to support a finding that they were less severe prior to that time.

■ Dr. Traynor believed the plaintiff's mood disorder was caused by a closed head injury that she suffered in a motor vehicle accident on July 21, 1997. The plaintiff was in the hospital until August 6, 1997. The ALJ's account of the plaintiff's discharge diagnosis shows the severity of her injuries:

> The claimant's discharge diagnosis was motor vehicle accident with hypovolemic shock, status post cardiac arrest, hemoperitoneum, closed head injury, basilar skull fracture, bilateral pneumothoraces, facial fracture, right iliac wing fracture, posterior rib fracture bilaterally, status post exploratory laparotomy, ligation of transected mesenteric vessels, some xiphoid pericardial windows, status pos Vac–Pac, status post open reduction internal fixation of facial fractures, and status post abdominal pain closure with mesh.

[R 15] This clearly shows the ALJ was aware of the severity of the plaintiff's injuries. In the absence of any competent medical evidence to the contrary, the ALJ should have determined the plaintiff's was mentally disabled from July 21, 1997, since that is when the closed head injury that causes her mental impairments occurred. The ALJ had an opportunity to recontact Dr. Traynor to clarify when she believed the plaintiff's impairments reached a disabling level but chose not to do so. One important aspect of the Commissioner's duty to develop a fair and complete record is her duty to recontact medical sources. The Commissioner's regulations provide as follows:

(e) Recontacting medical sources. When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision. To obtain the information, we will take the following actions.

(1) We will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques. We may do this by requesting copies of your medical source's records, a new report, or a more detailed report from your medical source, including your treating source, or by telephoning your medical source. In every instance where medical evidence is obtained over the telephone, the telephone report will be sent to the source for review, signature and return.

20 C.F.R. § 404.1512(e). The ALJ also had the opportunity to elicit additional medical evidence as to the plaintiff's mental impairment, but chose not to do so. *See Jenkins v. Sullivan*, 906 F.2d 107, 109 (4th Cir.1990)(noting the ALJ improperly analyzed the medical evidence himself rather than eliciting additional medical testimony from physicians).

Another reason given by the ALJ for refusing to credit Dr. Traynor's report was that the doctors treating the plaintiff for her other medical problems, primarily her

asthma, residuals of her motor vehicle accident and COPD, did not diagnose mental illness. The ALJ also remarked that their notes did not reflect the plaintiff complained of depression. This is not sufficient evidence to support the ALJ's decision to not credit Dr. Traynor. Again, the *Wilder* court's observations are very relevant, since that was apparently one of the reasons given by the ALJ in that case for refusing to credit the psychiatrist:

> The medical records were of purely physical ailments for which Wilder had sought help, and *there is no reason to expect a doctor asked about an eye problem, or a back pain, or an infection of the urinary tract to diagnose depression.* He is not looking for it, and *may not even be competent to diagnose it.* Because depression is a serious risk factor for suicide, doctors are constantly being urged to watch out for depression in their patients. The urging is needed because *doctors who are not psychiatrists are slow to diagnose a mental illness, such as depression,* that is not manifested in wild behavior. See, e.g., Harold C. Schulberg et al., "Major Depression in Primary Care Practice: Clinical Characteristics and Treatment Implications," 36 *Psychosomatics* 129 (1995).

*Id.* at 337 (citations omitted)(emphasis added). Therefore, it was unreasonable to reject Dr. Traynor's opinions based upon the lack of a diagnosis or notation of mental illness by her medical doctors who saw her for specific physical problems

 As noted above, ALJ Munford refused to credit Dr. Traynor's opinion that the plaintiff's disabling mental condition would be expected to last 12 months in part because he (ALJ Munford) believed that treatment would reduce the plaintiff's

symptoms to a non-disabling level. This was also an issue in *Wilder*:

> It is true that depression is eminently treatable nowadays, by a variety of anti-depressant drugs of which the best known is Prozac, see, e.g., Gary D. Tollefson, "Recognition and Treatment of Major Depression," *Am. Family Practice*, Nov. 1990 Supp., p. 59, and that a disabled person cannot obtain social security disability benefits if he or she refuses to follow a prescribed course of treatment that would eliminate the disability. *Ehrhart v. Secretary of Health & Human Services*, 969 F.2d 534, 538 (7th Cir.1992). But so far as the record discloses, Wilder has never been prescribed a course of treatment for her depression. Nor has the Social Security Administration ever suggested that her condition might be treatable. In these circumstances, the possibility of treatment that would enable her to work is not a defense to the claim of benefits.

*Id.* at 336–37 (emphasis added). It should be noted that ALJ Munford did not deny benefits based upon a failure to follow treatment. Rather, he found that "it is reasonable to conclude" that with treatment "the claimant's mental limitations would be no more than mild to moderate." In addition to this being an improper medical diagnosis by the ALJ, as noted by the *Wilder* court, the mere possibility of treatment that would improve the plaintiff's condition is not sufficient to support a denial of benefits. Should treatment in fact restore the plaintiff's ability to work, her benefits might be terminated under the appropriate legal standards. Likewise, should the plaintiff refuse without excuse to pursue prescribed treatment, her benefits would also be subject to termination.[5] However, the ALJ is not free to

---

5. Poverty excuses noncompliance with prescribed treatment. *Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir.1988).

deny benefits based upon his hunch that the plaintiff would improve with treatment when the only psychiatrist to have examined the plaintiff opined that the plaintiff's prognosis was "guarded."

[6–9] An ALJ is not allowed to make medical findings or indulge in unfounded hunches about the claimant's medical condition or prospect for improvement. He is not free to base his decision on such unstated reasons or hunches. Judge Johnson eloquently stated the proper role of an ALJ in his concurring opinion in *Marbury v. Sullivan*, as follows:

> An ALJ sitting as a hearing officer *abuses his discretion when he substitutes his own uninformed medical evaluations for those of claimant's treating physicians:* "Absent a good showing of cause to the contrary, the opinions of treating physicians must be accorded substantial or considerable weight by the Secretary." *Lamb v. Bowen,* 847 F.2d 698, 703 (11th Cir.1988).... An ALJ may, of course, engage in whatever idle speculations regarding the legitimacy of the claims that come before him in his *private or personal capacity;* however, as a hearing officer *he may not arbitrarily substitute his own hunch or intuition for the diagnosis of a medical professional.*

Because the ALJ made no factual findings supporting an inference that the treating physicians were incompetent or otherwise failed to perform their duties in a professional manner, the ALJ's decision not to credit seriously the medical diagnoses indicating psychogenically caused seizures cannot stand....

Although Social Security disability benefits must be reserved only for those who qualify to receive them, *an ALJ may not arrogate the power to act as both judge and physician.* The ALJ in this case clearly exceeded his legal authority by allowing his personal views regarding the non-physical source of Marbury's seizure disorder to interfere with his responsibilities to administer fairly the Social Security disability programs. On remand, let us hope that the ALJ refrains from playing doctor and instead satisfies himself with merely serving as a judge.

957 F.2d 837, 840–41 (11th Cir.1992)(italics in original)(emphasis added). Although Dr. Traynor does not qualify as a treating source under the Commissioner's regulations, the ALJ is still required to consider his report. 20 C.F.R. § 416.927(d). Because Dr. Traynor is a specialist, her opinion is entitled to more weight.[6] The thoroughness of her report also entitles it to greater weight.[7] No other medical source examined the plaintiff's mental status. Rather than accepting the opinion of the only examining psychiatrist, which clearly establishes disability, the ALJ "succumbed to the temptation to play doctor and make [his] own independent medical findings." *Rohan v. Chater,* 98 F.3d 966, 970 (7th Cir.1996).

This is not the first time ALJ Munford has improperly made findings as to the severity of a plaintiff's mental impairment without medical support. In *Batts ex rel. Batts v. Barnhart,* another judge of this court admonished ALJ Munford for improperly substituting his opinions as to the severity of a mental impairment without medical support and noted that it was not the first time. 198 F.Supp.2d 1286, 1287

---

6. "We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a medical specialist." 20 C.F.R. § 404.1527(d)(5)

7. *See* 20 C.F.R. § 404.1527(d)(3)(well supported opinions entitled to more weight).

(N.D.Ala.2002). In the future, let us hope that ALJ Munford heeds the admonition of Judge Johnson in *Marbury* and "refrains from playing doctor and instead satisfies himself with merely serving as a judge." 957 F.2d at 841.

## CONCLUSION

█ The Commissioner's consulting psychiatrist found the plaintiff to be mentally impaired due to her closed head injury which caused permanent brain damage. Dr. Traynor's report and accompanying Medical Source Statement (Mental) establish that the plaintiff meets Listing 12.02. There is no competent contradictory medical evidence in the record, and the ALJ simply substituted his own medical opinions about the severity and duration of the plaintiff's impairments for those of Dr. Traynor. Dr. Traynor believed the plaintiff's mental impairments were due to a closed head injury received as a result of a motor vehicle accident on July 21, 1997. There is no evidence in the record tending to show that the plaintiff's mental impairment had worsened between the time of the accident and the time of Dr. Traynor's examination. Therefore, substantial evidence does not exist to support the ALJ's decision that the plaintiff was not disabled after July 21, 1997. The action will be remanded with instructions that the plaintiff be awarded the benefits claimed with an onset of disability of July 21, 1997. An appropriate order will be entered contemporaneously herewith.

### *FINAL ORDER*

In conformity with and pursuant to the memorandum opinion entered contemporaneously herewith, it is

ORDERED, ADJUDGED and DECREED that the decision of the Commissioner of the Social Security Administration is hereby REVERSED, and the case is REMANDED to the Commissioner with instructions that the plaintiff be awarded the benefits claimed. It is

FURTHER ORDERED that the Commissioner withhold from payments that are determined to be due the plaintiff under this order an amount not to exceed 25 percent of the total amount of disability benefits to which the plaintiff is entitled, pursuant to the provisions of 42 U.S.C. § 406(b). The Commissioner is directed to advise the court of the amount withheld so that the matter may be set for final determination of the amount of attorney's fee to be allowed plaintiff's counsel for services rendered in representing plaintiff in this cause.

It is further ORDERED pursuant to Rule 54(d)(2)(B) of the Federal Rules of Civil Procedure, that plaintiff's attorney is hereby granted an extension of time in which to file a petition for authorization of attorney's fees under 42 U.S.C. § 406(b) until thirty (30) days subsequent to the receipt of a notice of award of benefits from the Social Security Administration. *This order does **not** extend the time limits for filing a motion for attorney's fees under the Equal Access to Justice Act.*