**Rosie WILDER, Plaintiff–Appellant,**

v.

**Shirley S. CHATER, Commissioner of Social Security, Defendant– Appellee.**

**No. 95–1520.**

United States Court of Appeals, Seventh Circuit.

Argued July 7, 1995.

Decided Aug. 29, 1995.

Barry A. Schultz (argued), Schultz & Winick, Chicago, IL, for plaintiff-appellant.

Carole J. Kohn (argued), Dept. of Health and Human Services, Region V, Office of the General Counsel, Thomas P. Walsh, Asst. U.S. Atty., Civ. Div., Chicago, IL, for defendants-appellees.

Before POSNER, Chief Judge, and BAUER and KANNE, Circuit Judges.

POSNER, Chief Judge.

This is an appeal from a denial of social security disability benefits. The facts are unusual. In August 1986, Rosie Wilder, who was then 47 years old, was employed as an armed, uniformed security guard in a retirement home. That month, she won $2 million in the Illinois lottery, payable at the rate of $81,000 a year (the rest being withheld, we assume, for income tax). Later that month she quit her job, and she has not worked since. In the same month, she adopted a grandson whose mother (one of Wilder's daughters) was a drug addict. Wilder sought disability benefits in 1990, claiming that she had been permanently disabled from engaging in gainful employment since 1986. The date of onset is critical. To be eligible for social security disability benefits without having to satisfy a means test, which Wilder could not do because of her lottery winnings, the applicant must have been employed for 20 of the 40 quarters preceding the onset of the disability, and Wilder did not satisfy this condition after December 31, 1986.

On the basis of testimony by her, by one of her daughters, and by a psychiatrist appointed by the administrative law judge to evaluate Wilder's condition, the administrative law judge concluded that she was *at the time of the hearing* "severely disabled ... because of major depression." The psychiatrist testified that Wilder had become disabled by the end of 1986, but the administrative law judge thought not. He pointed out that Wilder's medical records did not mention depression or other mental illness, that the records referred to her having "retired" from her job as a security guard, that she probably would not have been permitted to adopt a child had she been suffering from major depression, and that her daughters believed that her condition had gotten worse in 1988 and 1989, implying that it was less severe in 1986. The administrative law judge thought that Wilder had probably quit her job because she had won the lottery rather than because she was disabled, though the psychiatrist had testified that the winning of the lottery, combined with adoption of the grandson, might have precipitated the major depression that he thought had begun by the end of 1986. In upholding the denial of benefits the district judge thought it significant that Wilder had been permitted to carry a gun by her employer.

The parties seem to be agreed that at the time of the hearing in 1992, and presumably today, Wilder suffers from depression so severe as to be totally and permanently disabling, so that if her eligibility for social security disability benefits depended on her current rather than on her past health, she would be eligible. It is true that depression is eminently treatable nowadays, by a variety of antidepressant drugs of which the best known is Prozac, see, e.g., Gary D. Tollefson, "Recognition and Treatment of Major Depression," *Am. Family Practice*, Nov. 1990 Supp., p. 59, and that a disabled person cannot obtain social security disability benefits if he or she refuses to follow a prescribed course of treatment that would eliminate the disability. *Ehrhart v. Secretary of Health & Human Services*, 969 F.2d 534, 538 (7th Cir.1992). But so far as the record discloses, Wilder has never been prescribed a course of treatment for her depression. Nor has the Social Security Administration ever suggested that her condition might be treatable. In these circumstances,

the possibility of treatment that would enable her to work is not a defense to the claim of benefits. *Cassiday v. Schweiker,* 663 F.2d 745, 749 (7th Cir.1981); *Thompson v. Sullivan,* 987 F.2d 1482, 1489 (10th Cir.1993); *Fraley v. Secretary of Health & Human Services,* 733 F.2d 437, 440 (6th Cir.1984). One might have expected the Social Security Administration—actuated by motives financial as well as humanitarian—to assist Wilder, who besides psychiatric illness has only a sixth-grade education, and appears to be incompetent to look after her own affairs, to obtain the assistance she needs to become once again a productive member of society. But no; no one connected with this case, except the psychiatrist who testified, appears to know even the most elementary facts about depression, let alone care what happens to Wilder—for besides being disabling, untreated depression is a frequent cause of suicide. Tollefson, *supra,* at 62; Leslie Citrome, "Management of Depression," 95 *Postgraduate Medicine* 137 (1994).

We are led to consider with a degree of suspicion the administrative law judge's decision to go against the only medical evidence in the case, that of a psychiatrist not retained by the applicant but appointed by the administrative law judge himself to advise on Wilder's condition. Of course the administrative law judge is not required or indeed permitted to accept medical evidence if it is refuted by other evidence—which need not itself be medical in nature—and of course our review is deferential, and of course it is far from certain that Wilder was disabled in 1986. But the administrative law judge's analysis is so deficient that we must remand the case. The psychiatrist's testimony, though conclusional (but then no one pressed him to elaborate the grounds for his conclusions), was the only direct testimony concerning the critical issue of the date of onset of Wilder's disabling depression. Severe depression is not the blues. It is a mental illness; and health professionals, in particular psychiatrists, not lawyers or judges, are the experts on it. The question what stage a physical or mental illness had probably reached some years before it was first diagnosed is a medical question, and the uncontradicted evidence of the only disinterested

expert to opine upon it is entitled to considerable weight. *Scivally v. Sullivan,* 966 F.2d 1070, 1076 (7th Cir.1992); *Pugh v. Bowen,* 870 F.2d 1271, 1274 (7th Cir.1989); *Lichter v. Bowen,* 814 F.2d 430, 434 (7th Cir.1987); *Rivera v. Sullivan,* 923 F.2d 964, 969 (2d Cir.1991). We do not say conclusive weight; but the facts on which the administrative law judge relied to contradict that evidence are singly and together unimpressive. The medical records were of purely physical ailments for which Wilder had sought help, and there is no reason to expect a doctor asked about an eye problem, or a back pain, or an infection of the urinary tract to diagnose depression. Cf. *Spellman v. Shalala,* 1 F.3d 357, 363 (5th Cir.1993); *Rivera v. Sullivan, supra,* 923 F.2d at 969. He is not looking for it, and may not even be competent to diagnose it. Because depression is a serious risk factor for suicide, doctors are constantly being urged to watch out for depression in their patients. The urging is needed because doctors who are not psychiatrists are slow to diagnose a mental illness, such as depression, that is not manifested in wild behavior. See, e.g., Harold C. Schulberg et al., "Major Depression in Primary Care Practice: Clinical Characteristics and Treatment Implications," 36 *Psychosomatics* 129 (1995). This may be an especially serious problem in the black community. See Diane R. Brown et al., "Major Depression in a Community Sample of African Americans," 152 *Am.J.Psych.* 373, 378 (1995). Wilder is black.

The fact that, according to her daughters, Wilder got worse in 1988 and 1989 does not indicate how bad she was in 1986. That would depend on the rate at which she got worse, on which the record is silent. As for her being allowed to carry a gun, there is no evidence about how closely her employer monitored its employees. Wilder testified that she was very nervous when she was working (anxiety is frequently associated with depression, Schulberg, et al., *supra,* at 133), and was going to the bathroom so often that she had to ask one of the residents of the retirement home to sit with her and watch her desk when she was in the bathroom. Her daughter testified that Wilder had frequent crying spells at work. The fact

that someone is employed is not proof positive that he is not disabled, for he may be desperate and exerting himself beyond his capacity, or his employer may be lax or altruistic. *Jones v. Shalala*, 21 F.3d 191, 192–93 (7th Cir.1994); *Stark v. Weinberger*, 497 F.2d 1092, 1100–01 (7th Cir.1974); *Thompson v. Sullivan*, 928 F.2d 276 (8th Cir.1991); *Leidler v. Sullivan*, 885 F.2d 291 (5th Cir.1989). And the psychiatrist testified, as we have noted, that the winning of the lottery and the adoption of the grandson might have precipitated a major depression. Contrary to uninformed lay opinion, unexpected success can have as destabilizing an effect on a mentally ill person as unexpected failure, although this is far more likely in the case of schizophrenia than in the case of depression. George W. Brown & Tirril Harris, *Social Origins of Depression* 66, 103–04 (1978). The traumatic impact of winning lotteries, although it has been exaggerated, H. Roy Kaplan, "Lottery Winners: The Myth and Reality," 3 *Journal of Gambling Behavior* 168 (1987), has been noted in both the scientific and the journalistic literature. H. Roy Kaplan, *Lottery Winners: How They Won and How Winning Changed Their Lives* 45–67 (1978); Philip Brinkman, "Lottery Winners and Accident Victims: Is Happiness Relative?" 36 *J.Personality & Soc. Psych.* 917 (1978); Louis Gould, "Ticket to Trouble," *N.Y. Times*, April 23, 1995, p. B1; Peggy Y. Lee, "Lotto Pots Hold Joys, Trials for Big Winners," *Los Angeles Times*, Jan. 25, 1993, p. B1.

As the courts are besieged with cases in which the overworked staffs of state welfare agencies are accused of neglect, we find it difficult to take entirely seriously the suggestion that Wilder would not have been permitted to adopt her grandson if she had had severe depression. She had a good income, as a result of having won the lottery, and it is doubtful that the Department of Children and Family Services looked further. Moreover, another daughter was living with her at the time and it may have been understood that the daughter would be the one to take care of the child, with Wilder providing the money.

No doubt it is commonsensical to think that Wilder was fine back in 1986 and quit her job only because it was a low-paying, low-prestige job and she had just won $2 million. But she is entitled to a decision based on the record rather than on a hunch. The salient fact of record is the testimony of the psychiatrist, a disinterested as well as expert witness. Everything else is rank conjecture. And the weight that the administrative law judge attached to what the medical records do not show, or what Wilder's employer failed to do (fire, or at least disarm, a depressed employee), or what the harried DCFS failed to prevent (adoption by a mentally ill woman), does not evince a great deal of common sense about Wilder's social milieu.

We do not say that Wilder is in fact entitled to benefits, only that on the existing record the administrative law judge was unreasonable in denying benefits on the grounds he did. *Scively v. Sullivan*, supra, 966 F.2d at 1078. The case must be returned to the agency for further proceedings, which can of course include the taking of additional evidence to get to the bottom of this difficult and unusual case.

REVERSED AND REMANDED.